UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL JACKSON,

                    Petitioner

            -v.-

UNITED STATES OF AMERICA,

                    Respondent

21 Cr. 386 (LGS)

## THE GOVERNMENT'S MEMORANDUM OF LAW IN
## OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

T. Josiah Pertz
Assistant United States Attorney
        *Of Counsel*

1

**INTRODUCTION**

On May 20, 2022, Michael Jackson, the defendant, pleaded guilty to one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). Jackson was sentenced to 60 months' imprisonment. Jackson has now filed a habeas corpus petition under 28 U.S.C. § 2255, seeking to vacate his conviction in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

The petition is without merit. First, Jackson failed to raise this non-novel claim on direct appeal, and thus the claim has been procedurally defaulted. Moreover, the Second Circuit has upheld Section 922(g)(1) against facial challenge—a decision that *Bruen* does nothing to undermine. Guided by the Supreme Court's repeated statements about the constitutionality of prohibitions on the possession of firearms by felons, and bound by the Second Circuit's holding in *Bogle*, this Court should conclude that Section 922(g)(1) is constitutional. For these and other reasons set forth below, the petition should be denied.

**BACKGROUND**

I. **Offense Conduct**

On or about January 29, 2016, Michael Jackson, the defendant, was convicted upon a plea of guilty of attempted criminal possession of a weapon in the second degree in Kings County Supreme Court, and on or about February 8, 2016 was sentenced principally to a term of incarceration of 2 years. (Presentence Investigation Report ("PSR"), ¶ 7.)

At approximately 2:30pm on or about March 21, 2021, a dark-colored Honda four-door sedan (the "Honda") was driving in the vicinity of a certain address on E. 181 St. in the Bronx, near Jackson's residence. As the vehicle was stopped in traffic on E. 181 St., two individuals, Jackson and another individual ("Individual-1"), approached the vehicle. Both were wearing

2

black clothing and facemasks. Both entered the backseat of the Honda, with Jackson sitting in the rear passenger-side seat.  (PSR ¶ 8.)

As seen in surveillance video ("the Video"), as the Honda was traveling on E. 179 St., in the vicinity of Hughes Ave in the Bronx (the "E. 179th St. Address"), Jackson reached his hand out the rear passenger-side window. He was wearing a black glove, holding a chrome semiautomatic .45 caliber handgun. Jackson pointed the gun where two individuals were standing on the sidewalk nearby, and began shooting out the window. Jackson fired a total of eight shots over the course of a few seconds. The Honda continued westbound on E. 179 St. towards Arthur Avenue. (PSR ¶ 9.)  The Victims were not hit. One of the bullet fragments traveled through the window of an apartment near the E. 179th St. Address, landing on the resident's bed. (PSR ¶ 10.)

## II.   **Procedural Background**

On June 8, 2021, a grand jury returned an indictment (the "Indictment") charging the defendant with one count of being a felon in possession of ammunition in violation of Title 18, United States Code, Sections 922(g)(1) and 2, in connection with the offense conduct described above.  On June 10, 2021, the defendant was arraigned on the Indictment and ordered released on bail.

On May 9, 2022, per the suggestion of the court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government submitted a letter to the defendant, setting forth the Government's position regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to the defendant.  The Government stated its position that the applicable Guidelines range was 108 to 120 months' imprisonment, based on an offense level of 30 and a criminal history category of II. In

making this calculation, the Government applied the Attempted Murder guideline,

U.S.S.G. § 2A2.1(a)(1).

On May 20, 2022, the defendant pled guilty to that one count before United States

Magistrate Judge Barbara C. Moses. At his plea hearing, Jackson admitted his culpability for the

charged crime, stating, under oath, "On March 21, 2021, I possessed ammunition. I knew I had a

prior felony, which punishment was more than a year. The crime happened in the Bronx, and I

knew it was a crime for me to possess ammunition." (PSR ¶ 19; Plea Tr. 18:14-17.) This Court

accepted the plea on June 9, 2022. On June 28, 2022, per order of the Court, the defendant

surrendered and was taken into federal custody.

The United States Probation Office ("Probation") calculated the applicable Guidelines as

108 to 120 months' imprisonment, based on an offense level of 30 and a criminal history

category of II.  (Dkt. No. 50 at 19.)  In so calculating, Probation determined that the Attempted

Murder guideline applied. Probation recommended a custodial sentence of 72 months, followed

by three years of supervised release. In recommending a downward variance, it cited the

defendant's familial obligations and previous compliance while under community supervision.

(*Id.* at 20.)

At sentencing, on January 24, 2023, this Court agreed with Probation's Guidelines

calculation, and sentenced Jackson to 60 months' imprisonment on Count One, to be followed by

a three-year term of supervised release. (Dkt. No. 63.) The defendant also was ordered to pay a

mandatory $100 special assessment.  Jackson did not file a notice of appeal.

### III.    Jackson's 2255 Petition

On November 2, 2023, a petition under 28 U.S.C. § 2255 was docketed in this case,

bearing Jackson's signature and dated October 25, 2023 (Doc. No. 66, "the Petition.")  Jackson

4

claims he is being unlawfully detained on the sole basis that "922(g) [is] unconstitutional." (*Id.*, 4.)  The Petition attaches a six-page memorandum of law, citing cases including *Bruen* and *Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023), without providing analysis of how the cited cases apply here.

## ARGUMENT

### I.    Jackson's Petition Is Procedurally Deficient

#### A.    Applicable Law

##### 1.    Section 2255 and Procedural Default

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998); *see also, e.g., Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (" 'A collateral challenge may not do service for an appeal.' " (*quoting United States v. Frady*, 456 U.S. 152, 165 (1982))). "[A] collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000). " 'To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.' " *Soto v. United States*, 185 F.3d 48, 54 (2d Cir. 1999) (quoting *Frady*, 456 U.S. at 166).

A claim that could have been raised on direct appeal but was not has been "procedurally defaulted." *Bousley*, 523 U.S. at 622; *see United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."). Failure to raise a claim on direct review results in procedural default even where there has been a change in the substantive criminal law,

announced after the defendant's conviction became final, lending legal support to his claim.
*E.g.*, *Bousley*, 523 U.S. at 617-24; *Thorn*, 659 F.3d at 231-33; *see also Harrington v. United States*, 689 F.3d 124, 128–29 (2d Cir. 2012) (confirming that procedural default rules govern review of claim based on "new substantive rules of federal criminal law" announced after defendant's conviction became final).  A procedurally defaulted claim cannot be entertained unless the movant "can first demonstrate either [1] 'cause' and actual 'prejudice,' or [2] that he is 'actually innocent.'"  *Bousley*, 523 U.S. at 622 (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986)).

To show "cause" for failure to raise the claim on direct appeal, a defendant must demonstrate that "some objective factor external to the defense" prevented him from raising it, *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Carrier*, 477 U.S. at 488), "such as a claim that 'is so novel that its legal basis was not reasonably available to counsel' [and] kept him from raising the claim on direct appeal" (commonly referred to as the "novelty" or "futility" ground).  *Whitman v. United States*, 754 F. App'x 40, 42 (2d Cir. 2018) (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)).  "The futility test to excuse a default is strict: 'the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all.'"  *Thorn*, 659 F.3d at 233 (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)).  If the claim had been or was being raised by others at the time of direct review, it was "reasonably available," even if the claim would have been "unacceptable to [the direct appellate] court at that particular time."  *Bousley*, 523 U.S. at 623 (quoting *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982)); *accord Thorn*, 659 F.3d at 233.

Further, to establish prejudice, a defendant must show not merely "a possibility of prejudice," but errors that "worked to his *actual* and substantial disadvantage."  *Frady*, 456 U.S.

at 170 (emphasis in original).

Finally, where there is no judicially cognizable cause and prejudice to excuse the

procedural default, a court may reach the merits of the defendant's claim only upon a showing of

actual innocence. *Herrera v. Collins*, 506 U.S. 390, 404 (1993) (actual innocence exception is

meant to avoid grave miscarriages of justice – "to see that federal constitutional errors do not

result in the incarceration of innocent persons"). "It is important to note in this regard that

'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at

623.

### B.      Jackson Procedurally Defaulted His Claim

Jackson did not file a direct appeal challenging his conviction at all, let alone under

*Bruen*. Jackson procedurally defaulted his claim, and cannot overcome this default because he

cannot establish cause and actual prejudice, or that he is actually innocent.

As noted above, "cause" in this context requires an external impediment to raising a

claim, not merely a failure to recognize the argument or even a belief that the argument would

fail. *Bousley*, 523 U.S. at 623. Even if *Bruen* had suggested the unconstitutionality of section

922(g)(1) – which, as described below, it does not – *Bruen* had already been argued before the

Supreme Court (November 3, 2021) by the time that Jackson pled guilty (May 20, 2022) and its

arguments were not novel to Jackson. By the time that Jackson was sentenced in January 2023,

*Bruen* had already been decided, and litigants in this district had already filed challenges to

Section 922(g) based on *Bruen*. *E.g.*, Motion to Dismiss, Dkt. No. 66, *United States v.*

*Patterson*, 19 Cr. 231 (CS) (S.D.N.Y. July 29, 2022); *United States v. King*, 634 F. Supp. 3d 76,

83 (S.D.N.Y. Oct. 6, 2022) (Román, J.); *see also United States v. Cuney*, No. 15 CR 143 (VB)

(S.D.N.Y. Nov. 22, 2022) (challenging section 922(k)).

Thus, because he was able to raise a *Bruen*-based claim on direct appeal, Jackson cannot show cause for his procedural default. *See Mizell v. United States*, No. 14 Cr. 212 (RJS), 2020 WL 2216561, at *5 (S.D.N.Y. May 6, 2020) (disagreeing with courts that found cause for failing to raise on appeal a Section 924(c) vagueness claim prior to *Johnson v. United States*, 135 S. Ct. 2551 (2015) based on adverse Second Circuit authority because "the Supreme Court has repeatedly emphasized that futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time."); *Gatewood v. United States*, 979 F.3d 391, 395-98 (6th Cir. 2020) (finding no cause for failure to challenge as unconstitutionally vague residual clause of federal three strikes statute, 18 U.S.C. § 3559(c)(2)(F)(ii), because the tools to raise this argument existed at the time of default), *cert. denied*, 141 S. Ct. 2798 (2021).

Nor can Jackson show that he is actually innocent. Jackson does not claim that he is factually innocent. But even if he did, he would not prevail. "The Supreme Court . . . has made clear that the concept of actual innocence is distinct from the concept of legal innocence. In the context of a noncapital case, the concept of actual innocence is easy to grasp, because it normally means simply that the defendant did not commit the crime." *Poindexter v. Nash*, 333 F.3d 372, 380-81 (2d Cir. 2003). As described above, Jackson allocuted under oath to committing the charged offense, and is not factually innocent of the one count of conviction.

Furthermore, "[t]he Supreme Court has made clear that the actual innocence exception is very narrow and is concerned with actual as compared to legal innocence. The exception, therefore, does not apply where the petitioner merely makes a legal argument." *Darby v. United States*, 508 F. App'x 69, 71 (2d Cir. 2013). Accordingly, the exception does not apply here, where Jackson seeks relief on purely legal grounds.

In sum, Jackson has established neither (1) cause and actual prejudice, nor (2) actual

innocence. Therefore, his challenge is procedurally defaulted and this Court may deny Jackson's Section 2255 motion on that basis.

**II.**     **Jackson's Petition Fails on the Merits**

**A.**     **Bogle, Heller, and McDonald All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons**

The Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (confirming that the Supreme Court's most recent decision—in *Bruen*—specifically allows the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*).

Based on the Supreme Court's "emphasi[s] that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam) (quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786 (plurality)). And "[f]acial challenges to the statute's constitutionality have failed in every circuit to have considered the issue." *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (collecting cases), *cert. denied*, 140 S. Ct. 645 (2019).

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, *responsible* citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635 (emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see also*

9

*id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is *not a felon* and is not insane.") (emphasis added)). Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made . . . clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (plurality) (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, and expressly incorporating as law their discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that § 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281–82.[1] Nothing since *Bogle* has placed this conclusion in doubt. *See*, *e.g.*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as good law).

---

[1] The Second Circuit is not alone. Every single United States Circuit Court has considered this question and come to the same conclusion. *See*, *e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012); *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693–94 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013). *See also Bogle*, 717 F.3d at 281–82 ("We therefore join every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

The defendant seeks rely on *Range v. Attorney General,* 69 F.4th 96 (3d Cir. 2023) (en banc) ("*Range II*"). But even in *Range II,* the court did not find Section 922(g) to be facially unconstitutional. Rather, that decision was narrowly addressed to a defendant with a single misdemeanor conviction for making a false statement on an application for food stamps. As the majority wrote in that case, "Our decision today is a narrow one," addressed only to defendants "like Range." Nothing in that opinion suggests that the Third Circuit would reach a similar result in a case involving a defendant, like Jackson, with a prior felony conviction for unlawful firearms possession.

**B.      Bruen Does Nothing to Undermine Section 922(g)(1) or Bogle**

On June 23, 2022, the Supreme Court decided *Bruen*, which the defendant now argues renders Section 922(g)(1) unconstitutional. This argument has no merit: it would require the Court to disregard not only *Heller* and *McDonald*, but also *Bruen* itself.

*Bruen* considered a New York State law that pro-vided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which the Second Circuit had upheld using the means-end framework adopted by several courts of appeals to adjudicate Second Amendment challenges. 142 S. Ct. at 2122-23, 2125. The Supreme Court reversed, rejecting the means-end test, *see id.* at 2126-27, and reaffirming "Heller's methodology centered on constitutional text and history," *id.* at 2128-29. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

*Bruen* did not undermine all prior Second Amendment precedent in the Courts of Appeals. *See United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (concluding that prior circuit precedent upholding 18 U.S.C. § 922(g)(5)(A) "is undisturbed by *Bruen*, and we therefore remain bound by it"); *Lucha El Libertad*, 22 Cr. 644 (JSR), Dkt. 52 at 2-3 (noting that prior Second Circuit holding that Section 922(a)(3) "does not on its face regulate core Second Amendment conduct survives *Bruen* unscathed"). *Bogle* is wholly consistent with the *Bruen* framework and thus remains good law.

Critically, the Second Circuit did not employ in *Bogle* the means-end test later disapproved in *Bruen*; instead, the Second Circuit Court applied the reassurances of *Heller* and *McDonald* regarding the validity of "'longstanding prohibitions on the possession of firearms by felons.'"

*Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* are supported by history. *Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). It would therefore make little sense to conclude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s repeated admonitions that felon-disarmament is wholly consistent with the Second Amendment. *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786 (plurality).

Indeed, eight members of the *Bruen* Court have made clear that *Bruen* did *not* upend the Court's prior recognition of lawful firearm regulations. In *Bruen* itself, six justices took pains to emphasize that the decision did nothing to upset *Heller*'s and *McDonald*'s reassurances. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*. . ., about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S.

12

at 626)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms). In addition, two years earlier, Justice Thomas and Justice Gorsuch "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *City of New York*, 140 S. Ct. at 1540-41 (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting). Thus, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Moreover, the Supreme Court's express limitations of its own opinions—which help couch the boundaries of the test in *Heller* that was repeated in *McDonald* and clarified in *Bruen*—were not dicta. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (explaining that "the Court's language about certain long-standing restrictions on gun possession is [not] dicta" because "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings"); *United States v. Huet*, 665 F.3d 588, 600 n.11 (3d Cir. 2012) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta").[2] However, even if it were dicta, it must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court. *United States v.*

---

[2] Notably, in *Bruen*, Justice Kavanaugh—joined by Chief Justice Roberts—"wr[o]te separately to underscore two important points about the limits of the Court's decision," one of which was that "the Second Amendment allows a 'variety' of gun regulations," including prohibitions on convicted felons possessing firearms. *Bruen*, 142 S. Ct. at 2161–62 (Kavanaugh, J., concurring). Without Justice Kavanaugh and Chief Justice Roberts, the *Bruen* opinion would not have commanded a majority; accordingly, even if *Heller*'s limitation was once arguably dicta, it is controlling after *Bruen*.

*Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also, e.g., United States v. Colasuonno*, 697 F.3d 164, 178-79 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court dicta" except in certain circumstances, such as when Congress has "removed or weakened the conceptual underpinnings" of a decision). In any event, when the Second Circuit adopted the reassurances of *Heller* and *McDonald* as the core basis of its holding in *Bogle*, it became binding in this Circuit.

Accordingly, nothing in *Bruen* undercuts *Bogle*. By following *Heller* and *McDonald*, the Second Circuit necessarily upheld Section 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. By reaffirming *Heller* and *McDonald*, and counseling courts to adhere more closely to those cases, *Bruen* therefore effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald*, and, in any event, did not overrule it. *See, e.g., United States v. Peguero*, 34 F.4[th] 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is 'bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.'" (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004))). Thus, as several other judges in this District have concluded, *Bogle* remains binding on courts within this Circuit post-*Bruen*. *See United States v. Nelson*, No. 22 Cr. 436 (JGK), 2023 WL 6520378, at *2–3 (S.D.N.Y. Oct. 4, 2023); *United States v. Acevedo*, 22 Cr. 474 (KPF) (S.D.N.Y. Sept. 14, 2022) (oral ruling); *United States v. Espinal*, 23 Cr. 264 (SHS) (S.D.N.Y. Sept. 12, 2022) (oral ruling); *United States v. Davila*, No. 23 Cr. 292 (JSR), 2023 WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023); *United States v. Hampton*, No. 21 Cr. 766 (JPC), 2023 WL 3934546, at *11–13 (S.D.N.Y. June 9, 2023).[3]

---

[3] The Tenth Circuit recently considered the precedential force of a pre-*Bruen* decision holding Section 922(g)(1) constitutional. In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Court found that it was

These decisions join the unanimous rulings of judges in this District that the clear reasoning of *Heller*, *McDonald*, and *Bruen* foreclose any motion to dismiss a Section 922(g)(1) indictment. *See United States v. Abreu*, No. 23 Cr. 67 (NSR), 2023 WL 6541302, at *3–4 (S.D.N.Y. Oct. 6, 2023); *United States v. Barnes*, No. 22-cr-43 (JPO), 2023 WL 2268129 (Feb. 28, 2023); *United States v. Centeno*, No. 22-cr-542 (DLC) (Feb. 6, 2023); *United States v. King*, 634 F.Supp.3d 76, 83 (S.D.N.Y. 2022) (Roman, J.); *United States v. Patterson*, No. 19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Adams*, No. 20-cr-628 (AKH) (S.D.N.Y. Aug. 10, 2022); *United States v. Maurice*, No. 22-cr-48 (VB) (S.D.N.Y. Jul. 14, 2022).

### C.   Text and History Confirm that Section 922(g)(1) Is Consistent with the Second Amendment

Even if this Court were to ignore *Bogle* and consider the constitutionality of Section 922(g)(1) anew, the text and historical context of the Second Amendment make clear that Section 922(g)(1) is constitutional as applied to Jackson. As a felon, Jackson is not among the law-abiding, responsible citizens protected by the Second Amendment.

#### 1.   The Second Amendment's Text and Historical Context Demonstrate that Jackson, a Convicted Felon, Is Not Among "the People" Entitled to Second Amendment Rights

Felon-disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Contrary to Jackson's argument (Petition, 2), felons, like Jackson, do not fall

___

bound by its prior ruling in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009). The Court noted that *McCane*, like *Bogle*, had not employed the two-step test abrogated by *Bruen*. The Court additionally found that the *Bruen* decision, far from suggesting the invalidity of Section 922(g)(1), in fact suggesting the continuing vitality of pre-*Bruen* decisions upholding the law's constitutionality: "Given the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related background checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*." *Vincent*, 80 F.4th at 1202.

within "the people" protected by the Second Amendment, and "the right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses. Put simply, a convicted felon categorically falls outside the class of law-abiding, responsible persons to whom the Second Amendment applies.

Courts of Appeal have reached this conclusion both before and after *Bruen*. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"); *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment"); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) ("*Range I*") (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses"

16

can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon grant of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[4]

The Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580.  Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their criminal conduct and convictions.   As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1868).  Felons could therefore historically be excluded from "17xercise[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998)

---

[4] Although the en banc Third Circuit vacated the panel opinion in *Range* and ultimately reached a contrary result, the panel opinion retains its persuasive value—particularly with respect to its discussion of the historical record. *See Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).

(explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

Indeed, it remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote."  *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cnty. Sheriff 's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).  While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626); *see also, e.g., United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *Vongxay*, 594 F.3d at 1118.

While "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581; *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment), but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. And many other constitutional provisions use "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

*Bruen* makes plain that those, like convicted felons, who are neither law-abiding nor responsible cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th at 503 (collecting citations); *see also Range I*, 53 F.4th at 271 (observing that the *Bruen* "majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. In another passage, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the

19

jurisdiction are, in fact, 'law- abiding, responsible citizens.' " *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In yet another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

That non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text also explains the Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons. *Heller*, 554 U.S. at 626-27, 627 n.26, 635. In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. The defendant, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.; see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

The Second Circuit has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, [this Court] ha[s] interpreted the core Second Amendment right identified in *Heller* to be the 'right of *law-abiding, responsible citizens*.'" *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (quoting *Jimenez*, 895 F.3d at 234; emphasis in *Jimenez*); *accord, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent

challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)).   And in *Bogle*, of course, the Second Circuit rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history.   Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications."  *Heller*, 554 U.S. at 635.

### 2. Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearms Regulation

Even if Jackson, as a felon, is considered part of "the people" entitled to Second Amendment rights, a review of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of laws disarming people because of felony convictions, regardless of the specific nature of the felonies. Two categories of historical evidence are particularly pertinent: (a) laws demonstrating that the right to bear arms has historically been understood to attach to law-abiding individuals, not convicted felons; and (b) laws demonstrating that the right to bear arms has historically been understood to protect only responsible individuals.

### a. The Right to Bear Arms Has Historically Extended Only to Law-Abiding Individuals

In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison —where he would have no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also

usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 379-82. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted); *accord Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (noting that capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes"). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. *See Medina*, 913 F.3d at 158. Many States also subjected certain felons to forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 15 nn. 275-276 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam). As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming those convicted of such crimes. They did,

however, enact laws disarming people who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And a 1775 Connecticut statute provided that anyone convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). That legislatures disarmed people who had committed those minor offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966).

The founders also understood that the precise type of regulation challenged here is constitutional. Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 The Documentary History of the

Ratification of the Constitution 598 (Merrill Jensen ed., 1976).

### b. The Right to Bear Arms Has Historically Extended Only to Responsible Individuals

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274 (recognizing historical authority to "categorically disqualify people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact").

*England*. Because the Second Amendment " 'codified a right inherited from our English ancestors,' " English legal tradition sheds light on the scope of the " 'right secured by the Second Amendment' "—which, as with the English right, " 'is not unlimited.' " *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. One law, for example, provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—that statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502; *see also Range I*, 53 F.4th at 275 (recognizing that

Catholics were disarmed based on "perceived disrespect for and disobedience to the Crown and English law").

That example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142. And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the class's members would not abide by the law.

***Colonial America***. The American colonies inherited the English tradition of broad legislative authority to disarm classes of people viewed as untrustworthy or dangerous. Firearm regulations directed toward disarming Native Americans and Black people were pervasive.[5] Other colonial laws "followed longstanding English practice" by disarming Catholics who refused to take an oath of allegiance. *Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While those specific "categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. More-over, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to

---

[5]     *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006).

conduct evincing inadequate faithfulness to the sovereign and its laws." *Range I*, 53 F.4th at 276 (collecting examples).

 ***The Revolutionary War***. During the Revolutionary War, American legislatures passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent government. *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 277 (observing that legislatures "disarm[ed] non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"). An early example was a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in that vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law). The disarmament measures adopted during the early period of the

Republic reflect that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 279 (recognizing that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms").

  ***Ratification Debates***. The historical background of the Second Amendment's adoption demonstrates that the founders viewed the constitutional right to bear arms as compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One "Second Amendment precursor[ ]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on that basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628. The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Thus, the founding generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit firearm possession. *See*

*Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of disarmament."); *Range I*, 53 F.4th at 280 (observing that the proposal "distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament").

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added).

The Second Amendment as adopted does not include the same language as those proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at 29, could be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because that limitation "was understood"). Given the language of the influential proposals and the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that

such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

### c.   Comparison to Section 922(g)(1)

The historical tradition surveyed above demonstrates Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense."   142 S. Ct. at 2133.   Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event, the historical record shows that felons were historically subjected to dispossession of firearms—in addition to far more severe consequences, including estate forfeiture and capital punishment. History additionally shows that legislatures disqualified categories of people from possessing firearms, just as felon-dispossession statutes do today, based on legislative judgments that the disarmed people could not be counted upon to be responsible, law-abiding members of the polity.

The Government is not required to identify a law from the Founding Era that contains the exact proscription of Section 922(g)(1). Rather, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133 (emphasis in original). *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id.* at 2132.

### D.  An As-Applied Challenge Is Meritless

To the extent that the defendant raises an as-applied challenge, it is similarly meritless.

First, nothing in *Heller*, *McDonald*, or *Bruen* suggests the need for a felony-by-felony analysis of Section 922(g)(1)'s constitutionality. To the contrary, *Heller* and *McDonald* explain that "permissible . . . exceptions" to the Second Amendment include "longstanding prohibitions on the possession of firearms by felons," with no explicit limitation on the nature of the felons' crimes. *Heller*, 554 U.S. at 626, 635; *see McDonald*, 561 U.S. at 786 (plurality); *see also Jackson*, 69 F.4th at 502 ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

Second, recognizing that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year—is consistent with how the Supreme Court has interpreted other Bill of Rights provisions that require distinctions among different types of crimes. The Supreme Court has traditionally focused on the "maximum authorized penalty," which "provides an objective indication of the seriousness with which society regards the offense," rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). A similar approach should inform interpretations of the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. In

particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. *See Medina*, 913 F.3d at 160-61.

Third, a regime of individualized as-applied challenges to Section 922(g)(1) would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. Creating a system of as-applied exemptions from Section 922(g)(1) would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

Fourth, an as-applied challenge would treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, states have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. A felon cannot challenge those disabilities on the ground that they do not fit his felony or his circumstances. This Court should not treat the right to possess arms any differently.

Fifth, individualized as-applied challenges to Section 922(g)(1) would pose serious problems of judicial administration, creating a body of law that, in its reliance on historical analysis, would be more complicated to apply and more prone to creating inconsistent results than even the categorical approach. *See Quarles v. United States*, 139 S. Ct. 1872, 1881 (2019) (Thomas, J., concurring) (criticizing the categorical approach because it is "difficult to apply and

can yield dramatically different sentences depending on where a [crime] occurred"). This Court should reject any invitation to create such an unwieldy and unpredictable new body of law.

## **CONCLUSION**

Jackson's Petition should be denied.

<div style="margin-left:40%">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:  /s/ T. Josiah Pertz_____
T. Josiah Pertz
Assistant United States Attorney
(212) 637-2246

</div>